SUPREME COUNCIL OF THE ROYAL ARCANUM, complainant-respondent,

*v.*

SIDNEY HERBERT ALEXANDER et al., defendants-appellants.

[Submitted July 10th, 1916. Decided November 20th, 1916.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Backes, who filed the following opinion:

A member of the Royal Arcanum caused his death benefit certificate to be made payable to his wife. Later, while the certificate was in his wife's possession, he obtained a new certificate payable to his son. On interpleader between mother and son for the proceeds, *Held,* that (1) the member had the right to change the beneficiary and that an affidavit by the member, submitted to the Arcanum to procure the change of beneficiary, setting forth the loss or ignorance of the whereabouts of the first certificate, even if false, did not affect the legality of the second certificate as between the beneficiaries inasmuch as the fraud could only be taken advantage of by the Arcanum, which right it had waived by the filing of the bill and surrendering the fund; (2) upon payment of the fund into court, equity will treat it as the property of the member and will dispose of it upon equitable principles according to the rights of the claimants.—*Held, also,* that as between the two claimants the holder of the last certificate has the superior legal right which may, however, be displaced by superior equities of the prior certificate holder. —*Held, also,* that equities of the latter, as a purchaser of the first certificate, or as holder thereof as security for moneys lent to the member, were not sustained by the proofs.

I will dispose of the case now. There is no material conflict in the testimony—due perhaps to the fact that the witnesses testified to matters and occurrences not related to the same period; and the principles of law involved and to be applied are not seriously disputed by counsel.

On May 3d, 1889, William Henry Alexander became a member of the Royal Arcanum and entitled to a death benefit of $3,000. The death benefit certificate issued at that time was made payable to his wife, Madeline Alexander. On September

4th, 1912, at the request of the member, the Royal Arcanum issued a new certificate, payable to the member's son, Sidney Herbert Alexander. Upon the death of the member, November 28th, 1914, the widow and son each made claim to the benefit, whereupon the Royal Arcanum, being disinclined to determine the rights of the claimants, paid the money into court and obtained a decree that they interplead, and the parties are now here—the mother on one side, the son on the other—asking that the court award to them as against the other, the money.

Aside from the special equities set up by the mother, and to which I will hereafter refer, the status of the claimants as beneficiaries under the laws of the Royal Arcanum is equal. Each is, within the class designated by the laws of the order, qualified to be a beneficiary; by those laws the selection is left entirely to the member; having once nominated a beneficiary, it is also his right under the provisions of the order, to change the beneficiary. And from a moral and equitable viewpoint, as this case developed, it seems to me that the mother, as a dependent and an object of the member's bounty, has no greater claim than the adult son. In the strictly legal aspect of the case, the son, as the holder of the last certificate, occupies the superior position, and the first attack, in order to overcome this, is as the mother contends, that the son's certificate was procured by the member fraudulently, in violation of the rules of the organization, and that it is void. As I recall the law of the order as it was read to me, a member of the order has the right at any time, upon surrender of the certificate, to change the beneficiary, or, if the certificate is lost or beyond his control, upon proof of the fact, by affidavit or otherwise, to the satisfaction of proper officers, he may obtain a new certificate with the change of beneficiary.

It is claimed that in 1912, when the new certificate was issued, and to obtain it, the member in writing, under oath, stated that the old certificate was lost and beyond his control, or words to that effect—I do not now recall the exact language—and the claim is that the member at the time knew the policy to be in his wife's possession, and that he knowingly falsely and fraudulently made the affidavit. I have very serious doubts whether, even though the affidavit was thus false, the question can be

raised in this litigation over the fund by the beneficiaries. I am inclined to think that the naming of a beneficiary in the certificate of a benevolent society is for the guidance of the organization, and that the fraud can only be taken advantage of by the organization in testing its liability under its certificate, and that this defence is waived when the fund is paid unto court. But I need not pass upon that, because the evidence does not satisfy me that the affidavit was fraudulently false. The mother testified that on Friday, April 14th, 1911, about ten o'clock in the forenoon, at Arlington, just while they were getting ready to go to Atlantic City to open up their summer home, her husband handed her four papers, saying, "These are yours; take care of them; put them in the bank-box." Their little daughter, who was then ten years old, and who now lives with the mother, says she saw the occurrence and that father said, "Mother, these papers belong to you; take care of them." The four packages contained an old will, a deed for a cemetery lot, a policy in the Prudential, and the certificate in the Royal Arcanum. The mother says that her husband had a satchel full of papers at the time; that he spread them all over the table, and selected these four. She does not say, nor does it appear, that the member identified any of the papers by their proper designation; or, from anything he said, that he knew one of them was the Royal Arcanum certificate.

Now, the deduction I am asked to make from this testimony is, that fourteen months afterwards the member, knowing where the policy was, deliberately perjured himself. I cannot believe that the widow and this little daughter intended that their testimony could, or should, have that effect; but, that is the implication. If the member delivered over these four papers, as the mother and daughter say he did—taking into consideration the other testimony in the case, that in 1910 he stated to a fellow member of his lodge that he intended to make a transfer to the son, and in 1912 to the same member and another that he intended to make the transfer, and at that time to one of them that he did not know where his certificate was; that it was somewhere about, and he thought his wife had it—isn't it a fairer inference that, when he turned the four bundles over, he

was not mindful that one was the certificate, or else that he had forgotten the event? There was no reason for him to resort to something so sordid as a false affidavit to obtain the change. If he knew that his wife had the certificate, he could have so stated, and probably truthfully, that it was beyond his control, and that would have sufficed. The proofs in the case are far from satisfying me that the affidavit was deliberately falsely made. On this score the mother fails.

So I will take up the matter of the special equity of the mother, to which I have referred, and upon which her counsel chiefly relies. Her claim is that after the certificate was delivered to her, in April of 1911, she, on the strength of it, at various times advanced to her husband $9,000, in the expectation that she would be partly reimbursed out of the fund at his death. Now, as I understand the authorities in cases of this kind, where the fund is paid into this court and the strife is, as it here is, between two claiming it, equity will treat the fund as the property of the member, and make disposition of it upon equitable principles. So that, even though the son's legal right in this case is superior to that of his mother, he may be outclassed by her equities. I have some misgiving as to the accuracy, I will not say truthfulness, of the mother's and daughter's testimony that the father made formal delivery of the certificate to the mother on April 14th, 1911, because only a short time before, in 1910, if we believe the disinterested witnesses, he had intended to transfer it to his son. That this was a firm resolve appears from a reiteration of his intention, made in 1912, just before the transfer to the son was made. And, in this regard, I may say that the apparent keenness of the memory of the daughter, who was then only ten years old, attracted my attention. It may be that in the bundle of four papers the mother got, the certificate was included, but I question whether it was handed over knowingly. But, if it was handed over, it seems to me it was done only for safekeeping. Now, when the certificate was delivered in 1911, if it then was delivered, the mother took it upon condition of the member's right to make a change in the beneficiary, unless she at that time obtained it for a valuable consideration; or, later on, passed a valuable consideration referable

to it. That she gave no valuable consideration for the certificate at the time it was delivered to her is admitted. So it appears that she cannot lay claim to the whole fund by way of purchase at that time; and it does not appear in the evidence, if in fact she thereafter advanced money to her husband, that any money was advanced—lent—on the strength of the security of the certificate. If she did lend her husband money thereafter, then the burden is upon her to show me, in dollars and cents, how much she advanced, and only to that extent will her equitable rights be superior to that of her son. And this she has not done with any degree of satisfaction. She does say, in so many words, that she lent to her husband $9,000 and upwards, and to her counsel stated that she had tabulated the various sums for him, but the tabulation was not produced, that I recall. She produced this bundle of checks, made out in her husband's favor, and which she claims represents that amount and exceeds it. I am not at all satisfied she lent her husband any money, in the legal sense. If she advanced him any money at all, I am inclined to think that it was of their joint fund, and if she lent him any I am satisfied that it was fully repaid. And let me explain how I come to the conclusion that there was no money lent. They were married in 1883, and were in humble circumstances. He was a plumber and prospered in his business. She was thrifty, took in boarders, made money on a smale scale and saved it. They saved and accumulated money in common interest. In 1905 the husband turned all of his real estate, some of which he got from his parents, over to his wife. In fact, all that he possessed, up to within a month of his death, he turned over to her. Their joint accumulations represented by real estate at the time of his death, in his wife's hands, amounted to about $35,000. The only property she did not get is the fund now in dispute. After her husband turned his property over to her in 1905, she became the dominant factor in the matter of finances, at least, and I think she managed her part well, too. She looks like a clever, shrewd, calculating woman, who, as a man, would have made her mark in the business world. Thereafter, notwithstanding her ascendency, he continued in his occupation and they

worked together, probably as they had before, but he appears to have surrendered the financial management pretty much to her. She was in control of their affairs.

Now, I have said that there were no loans made by her to her husband in the legal sense. By that I mean that the amount said by her to have been advanced, and represented by the bundle of checks before me, were of moneys belonging to the two, although held in her name, and that these moneys were spent by the husband in the interest of both. He engaged in business, bought real estate from time to time, and many of these checks, according to Mrs. Alexander's admission, were used in improving the realty which was either in her name at the time, or which afterwards her husband conveyed to her. She benefited and I think to the full extent of the moneys represented by the checks which she gave to her husband. In 1911 or 1912 he sold his Arlington avenue property and bought a home in Philadelphia, which he placed in his wife's name. Another property in Philadelphia, which he bought with money she gave him to engage in the haberdashery business, he afterwards conveyed to her; and a month before he died, he conveyed to her his last piece of property, No. 4 Palisade avenue, for which he had an offer of $17,000, and on which there was a mortgage of $7,500. These sums, represented by the checks given by her to her husband, it seems to me, were used in a joint enterprise, the fruits of which she now enjoys. The checks were for moneys advanced but not lent. Not a single item of this mass of checks has been pointed out and proved as representing an out and out loan, to which the certificate in question may be attached as security. The burden of doing this was upon the widow, and in this she has failed.

After the death of her husband, Mrs. Alexander paid some of his debts, something like $1,000, as she says, in the expectation that she would be reimbursed out of this death benefit. It must not be overlooked that she at that time also had as much coming to the estate from the Prudential Insurance Company. It is not shown how these debts were contracted, or for whose benefit, but from the general complexion of the case, it does ap-

pear that whatever there was beneficial from the exertions of Mr. Alexander, after his wife took hold, went to their joint benefit, and whatever losses were sustained came from their joint funds. The debts were debts of the combination—*quasi* copartnership debts—which she paid, not in reliance upon the benefit certificate, but because it was her obligation to pay, and she must have realized that had she not done so, a bill in equity would have enforced payment out of the Palisade avenue property, which was conveyed to her only a month before her husband died.

To summarize: The certificate was not delivered to the wife for a valuable consideration, and on that score she had no equity superior to her son. It was not delivered to her upon any understanding of security for future advances. She has not proved that she lent her husband any money upon the security of the certificate, expressly or by implication, and for this reason she has no rights outreaching those of her son. She held the certificate, if by delivery, without any contractual rights, and at all times subject to the right of change of beneficiary.

I said before, that from a moral viewpoint the widow, as a dependent, was not entitled to any greater consideration than the son. There has been an estrangement between mother and son since 1909, but none between father and son. Mr. Alexander realized that on his death the son could expect nothing from his mother, and the wife then being in comfortable circumstances, it was not unnatural to give to the son the only bit of property then under his control and subject to his disposition.

The money in court will be awarded to the son. Under the circumstances, costs will not be imposed.

*Mr. Harrison H. Voorhees,* for the respondent.

*Mr. William M. Seufert,* for the appellant.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Backes.

Commonwealth Title, &c., Co. *v.* N. J. Lime Co.     *86 N. J. Eq.*

*For affirmance*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, WHITE, HEPPENHEIMER, WILLIAMS, TAYLOR, GARDNER—14.

*For reversal*—None.